**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| TIWANA HARRIS, o/b/o R.C., ) | CASE NO.   4:11-cv-0225 |
|              ) | |
| Plaintiff,   ) | |
|              ) | |
| v.           ) | MAGISTRATE JUDGE VECCHIARELLI |
|              ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
|              ) | MEMORANDUM OF OPINION |
| Defendant.   ) | |

This case is before the magistrate judge by consent.  Plaintiff, Tiwana Harris ("Harris") o/b/o R.C., challenges the final decision of the Commissioner of Social Security, Michael J. Astrue ("Commissioner"), denying Harris's application for child's Supplemental Security Income ("SSI") under the Social Security Act ("Act"), 42 U.S.C. § 1614(a)(3).   This court has jurisdiction pursuant to 42 U.S.C. § 405(g).

For the reasons set forth below, the court REVERSES the decision of the Commissioner and REMANDS the case for a more complete determination of whether R.C. is limited in the domain of caring for herself, as discussed below.

I.  Procedural History

Harris filed an application for SSI on behalf of R.C. on December 12, 2007,

alleging disability due to bipolar disorder as of November 1, 2007.  Harris's application was denied initially and upon reconsideration.  Harris timely requested an administrative hearing.

Administrative Law Judge John J. Porter ("ALJ") held a hearing on July 13, 2009.  R.C., represented by counsel, and Harris testified on R.C.'s behalf at the hearing.  The ALJ issued a decision on July 30, 2009, in which he determined that R.C. is not disabled.  Harris requested a review of the ALJ's decision by the Appeals Council.  When the Appeals Council declined further review on December 20, 2009, the ALJ's decision became the final decision of the Commissioner.

Harris filed an appeal to this court on February 1, 2011.  Harris alleges that the ALJ erred because the ALJ failed to find that R.C.'s bipolar disorder and conduct disorder cause marked impairment in at least two domains of functioning.  The Commissioner denies that the ALJ erred.

## II.  Evidence

*A.    Personal Evidence*

R.C. was born on July 7, 1994 and was 15 years old at the time of the administrative hearing.  She was first diagnosed with a disruptive behavior/conduct disorder on February 6, 2007and diagnosed with a bipolar II disorder on November 1, 2007.

*B.    Medical and Academic Evidence*

On November 16, 2006, the Juvenile Division of the Trumbull County, Ohio Court of Common Pleas ("the juvenile court") adjudicated R.C. an unruly child.  Transcript ("Tr."), p. 130.  At that time, she already had been on probation for about two years.  Tr.

2

at 134.  The juvenile court continued her probation.

On February 6, 2007, R.C. appeared at Valley Counseling Services, Inc. ("Valley Counseling") for treatment upon referral by her probation officer.  Tr. at 253-64.  An initial diagnostic assessment of R.C. described her as suffering from an unspecified disruptive behavior disorder.  The assessment noted that R.C. had nine siblings, that her mother, Harris, was a single parent, and that R.C.'s father was in prison.  Harris reported that R.C. was constantly in trouble, getting into fights at home and at school.  These behaviors were relatively recent in origin, and they were triggered by teasing and criticism.  R.C.'s problems were sufficiently serious that the school had suspended R.C. four times that year for fighting.  In addition to fighting, the assessment described R.C. as having depressed mood, mood swings, hyperactivity, and light sleep.  A section of the assessment entitled "Exams Taken" noted that R.C. had passed Reading, Citizenship, and Writing but failed Math and Science.  R.C. was in regular classes, not special education classes.  R.C. was well-groomed, and the notes described her as of average intelligence with no impairment of cognition reported.  The intake counselor assigned R.C. a Global Assessment of Functioning ("GAF") of 45.[1]

The Warren School District expelled R.C. from school from March 15, 2007 through May 30, 2007.  Tr. at 129.  The District recommended that she attend the Washington Alternative Learning Center during the 2007-08 school year. and recommended her for placement at an alternative school for the following school year.

On May 14, 2007, the juvenile court found R.C. to be in violation of her probation

---

[1] A GAF of 41 to 50 indicates serious symptoms or a serious impairment in social, occupational, or school functioning.

3

and adjudicated her to be a delinquent child.  Tr. at 131.  The court sentenced her to one to ten days in the juvenile center.

On November 1, 2007, R.C. underwent a psychiatric evaluation at Valley Counseling.  Tr. at 270-273.  The report described R.C. as getting mad quickly at home with verbal and physical results, switching moods quickly, fighting with peers, stealing, and destroying property.  It also noted that R.C. had been suspended from school multiple times and been in the juvenile justice center for unruly behavior.  She was reported to be taking Abilify to help her sleep and Geodon.  During the interview, R.C. displayed full affect but was angry and irritable.  The evaluation also described her as both cooperative and assaultive with impairment of attention/concentration.  The interviewer estimated her intelligence as average, diagnosed R.C. as suffering from bipolar disorder, and assigned her a GAF of 50.

A progress note from Valley Counseling on December 6, 2007 observed that R.C.'s medications were working and that her attitude had improved lately.  Tr. at 268-69.  It also observed that she had been in school for two to three weeks without problems but that there was still room for improvement.

On January 8, 2008, R.C.'s English/Language Arts teacher for the 2007-2008 school year, Renee Beauchene, completed a teacher questionnaire at the request of the Bureau of Disability Determination ("the bureau").  Tr. at 143-50.  Beauchene indicated that she had seen R.C. for an hour a day, five days a week, as of September 2007.  She estimated that R.C. was reading on a fourth grade level and writing on a fifth grade level.  Beauchene then rated R.C. in each of five functional domains.

In "Acquiring and Using Information," Bauchene rated R.C. as having slight

problems with understanding school and content vocabulary, reading and comprehending written material, and recalling and applying previously-learned material. Beauchene found no problems in seven other related skills.

In "Attending and Completing Tasks," Beauchene opined that R.C. had a slight problem, manifested monthly, with focusing long enough to finished assigned acitivities or tasks, refocusing to tasks when necessary, carrying out multi-step instructions, and completing class/homework assignments. She also opined that R.C. had obvious problems, manifested weekly, with changing from one activity to another without being disruptive and working without distracting herself or others. Beauchene found no problems with six other related skills.

In "Interacting and Relating to Others," Beauchene found that R.C. had slight problems, manifested monthly, with asking permission appropriately, introducing and maintaining relevant and appropriate topics of conversation, taking turns in a conversation, and interpreting verbal and nonverbal cues. She also found that R.C. had obvious problems, manifested weekly, with seeking attention appropriately, expressing anger appropriately, and respecting/obeying adults in authority. Beauchene did not find problems with four related skills, but also noted that she had used time-outs, removals from class, and telephone calls to home to deal with the problems in this area.

Beauchene found no problems in "Moving About and Manipulating Objects."

Finally, in "Caring for Herself," Beauchene opined that R.C. had a slight problem, manifested monthly, with using good judgment regrading personal safety and dangerous circumstances. She also opined that R.C. had obvious problems, manifested weekly, with handling frustration appropriately, identifying and appropriately

5

asserting personal needs, responding appropriately to changes in her mood, and using appropriate coping skills to meet the daily demands of the school environment. Beauchene found no problems with four other related skills but added, "This child has occasional difficulties with handling her frustrations and anger." Tr. at 148.

A progress note from Valley Counseling on January 24, 2008 noted that R.C. could not sleep if she missed her medications. Tr. at 266-67. It also noted that R.C. had been stealing and removed from class, although there had been no suspensions. R.C.'s dosage of Goedon was increased.

At the request of Harris, on January 30, 2008, Harris and R.C.'s teachers, case manager, counselors, and the school psychologist conducted an "intervention" to assess R.C.'s progress and modify school procedures in light of that assessment. Tr. at 161. R.C.'s teachers reported that R.C. had behavioral problems but no academic concerns and that she had made a tremendous improvement in her behavior since the beginning of school. The team made some classroom modifications, including increased use of small group settings, proximity control, social skill development, and use of time outs in response to their discussion. They also noted that on-premise assistance from Valley Counseling staff was available.

On February 28, 2008, Valley Counseling revised R.C.'s service plan to include therapeutic interventions at school and home. Tr. at 342-43. The plan aimed at teaching R.C. to better cope with anger and develop a more positive attitude. In the box entitled, "Strengths and How They Will Be Used to Meet This Goal," the individual completing the form wrote, "[R.C.] is very intelligent and understands there are consequences to her behavior." Tr. at 342.

6

Valley Counseling progress notes from March 6, 2008 reported that R.C. had been home for 14-15 days and that she was irritable, moody, mean, yelling, and fighting. Tr. at 336-37. The also reported that she had not been able to sleep well. The report concluded that R.C.'s medications were not working.

On March 4, 2008, David L. Chiarella, a pediatric psychologist, conducted a clinical interview with R.C. and Harris at the request of the bureau. Tr. at 276-78. Harris reported that R.C. had a long history of disruptive, oppositional, and noncompliant behavior. Harris also reported that R.C. was taking Geodon, which was helping her. Harris denied that R.C. had any cognitive or learning problems. When Dr. Chiarella interviewed R.C. alone, she was cooperative but guarded, and she displayed a flat affect. R.C. denied being depressed or unhappy and said that she picked on other children because it was fun. In his summary, Dr. Chiarella wrote in relevant part as follows:

> The interview revealed that [R.C.] does not present with any significant cognitive or academic deficiency. Her cognitive and academic skills are likely to be age appropriate. She does not present with any communicative disorder. She was able to use and understand conversational speech to make her needs and wants known. The intelligibility was 100% in an unknown context. . . . She does demonstrate a maladaptive pattern of behavior problems, largely of a conduct disturbed nature. Socially, she does not interact or relate well to others. Her personal behavior as well as her social and emotional skills are developed at approximately 50% of her age expectations.

Tr. at 278. Dr. Chiarella diagnosed R.C. as suffering from a conduct disorder and assigned her a GAF of 50.

On March 10, 2008, the juvenile court sentenced R.C. to 1 to 30 days in the juvenile justice center for violating her probation. Tr. at 183. R.C.'s school conducted another expulsion hearing on April 3, 2008. Tr. at 184. Instead of expelling R.C.,

7

however, the school put R.C. on probation for the remainder of the school year. Tr. at 162.

On April 11, 2008, a state agency psychologist, David Dietz, Ph.D., completed a Childhood Disability Evaluation Form on the basis of the record to assess R.C.'s functional capacity. Tr. at 279-84. Dr. Dietz opined that R.C. did not meet, medically equal, or functionally equal a listed impairment. He also opined that R.C. had no limitations in the domains of moving about and manipulating objects, caring for herself, or health and physical well-being; had less than marked limitations in acquiring and using information and in attending and completing tasks; and had marked limitations in interacting and relating with others. (Tr. 281-82). Psychiatrist Irma Johnston affirmed Dr. Dietz's opinions on July 15, 2008. Tr. at 287.

An individualized Service Plan Review completed at Valley Counseling on May 1, 2008 noted, "Client continues to be physically aggressive towards siblings 75% to 80% of the time. Client also exhibits poor social skills and can not cope with difficult situations." Tr. at 341. The review stated that R.C. would not be discharged until she developed a more positive attitude and learned how to interact with others in a more positive manner.

On May 8, 2008, Dr. William Price from Valley Counseling wrote a letter stating that R.C. had been diagnosed as suffering from bipolar disorder II. Tr. at 285. According to the letter, R.C. exhibited severe mood swings which caused significant impairment in her ability to function at school and at home. He opined that R.C. needed constant parental supervision until school opened again in the fall.

On May 8, 2008, several teachers indicated on R.C.'s interim progress report that

she was easily distracted. Tr. at 181. Two teachers noted that she completed assignments regularly, one that she demonstrated a good attitude in class, one that her behavior needed to improve, and one that she was working at grade level. R.C.'s cumulative grade point average for the 2007-2008 school year was 0.0. During the year, R.C. earned interim grades of two B/Cs, one C, one C/D, and one D/F. Apparently, her teachers issued two final grades, two Bs and an F, but none of the grades was counted towards her average, probably due to attendance issues. Comments on her report card cited problems with behavior, distractibility, and attendance.

R.C.'s school expelled her again from May 13, 2008 until June 4, 2008. Tr. at 175.

On May 15, 2008, progress notes again reported that R.C. was irritable, short-fused, and nasty and was again having trouble getting to sleep. Tr. at 331-32. The note also stated, "Behavior actually ok." Tr. at 331.

A June 23, 2008 progress note indicated that R.C. felt as though her mother did not care about her and believed what others said rather than what she said. Tr. at 311. R.C.'s counselor found that she was cooperative.

On June 23, 2008, R.C.'s counselor, Cynthia Coleman ("Coleman"), completed Ohio Youth Problem, Functioning, and Satisfaction Scales assessing R.C. Tr. at 315-16. Coleman opined that within the past 30 days R.C. had experienced arguing with others, had fits of anger, and had refused to do things teachers or parents ask most of the time. She also opined that R.C. often engaged in yelling, swearing, or screaming at others; breaking rules or breaking the law; lying; feeling worthless or useless; and

9

worrying that something bad is going to happen; and that R.C. had several times caused trouble for no reason, talked or thought about death, felt anxious or fearful, or felt sad or depressed.  Coleman indicated that R.C. was doing very well in keeping neat and clean and "looking good" and that she had "ok" skills in concentrating, paying attention, and completing tasks; learning skills that will be useful for future jobs; earning money and learning how to use it wisely; caring for health needs and keeping good health habits; participating in recreational activities; getting along with friends; and dating or developing friendships with boyfriends or girlfriends.  Coleman rated R.C. as having "some trouble" with being motivated and finishing projects, completing household chores, and attending school and getting passing grades in school.

In July or August 2008, R.C. told her psychiatrist that she had tried to stab her sister and was still aggressive toward other siblings.  Tr. at 305.  She also reported that she was sleeping better.  On August 21, 2008, progress notes indicated that R.C. was "ok" at school but still had "moods," had hit her siblings, and had chased a girl home and followed the girl into her house to "cuss them out."  Tr. at 303-04.

In October 2008, Harris reported that R.C. remained disrespectful and was verbally and physically aggressive toward her siblings.  Tr. at 296.  R.C. was generally cooperative and participated in group and individual counseling sessions.  Tr. at 293, 295-96, and 298-99.  Nevertheless, R.C. also exhibited constricted affect, withdrawn behavior, and irritable mood at times.  On November 24, 2008, R.C. did not participate and exhibited a poor attitude, a lack of motivation, and irritability in her anger management class.  Tr. at 288.

In early 2009, R.C. broke a bedroom door, a house window, and her mom's car

window.  Tr. at 423, 425, 432, and 434).  R.C. had trouble paying attention and following directions in groups anger management on February 11, 2009.  Tr. at 429.

In January and February 2009, Harris talked with R.C.'s psychiatrist about R.C.'s behavioral problems at home, including conflicts with her siblings, and her behavioral problems at school, including increased defiance of authority and rules.  Tr. at 423-25, 434, 443, at 445.  R.C. was more cooperative in therapy sessions in late January and February 2009, and her behavior improved somewhat in late February.  Tr. at 421, 430-31, 439.  On March 3, 2009, however, R.C. was suspended for verbal aggression towards a teacher and left home without permission intending to fight a peer.  Moreover, Harris was concerned that R.C. was not being held accountable for probation violations.  Tr. at 419.  On March 4, 2009, R.C. participated and behaved appropriately in group sessions.  Tr. at 416.  On March 23, 2009, R.C. was suspended for using profanity at school.  Tr. at 394.

On April 21-22, 2009, progress notes at Valley Counseling recorded that R.C. continued to have relationship problems with her siblings and was only semi-cooperative in counseling.  Tr. at 383.  They also noted, however, that R.C. was doing somewhat better at school since her suspension.  Tr. at 384.  Progress notes on May 12, 2009 reported that R.C. had recently been suspended several times and that she had been disrespectful and fighting.  Tr. at 373-74.  The reports also stated that R.C. continued to minimize her behaviors and did not accept responsibility for them.

An April 24, 2009 progress note described R.C. as doing better in school and at home since her recent suspension.  Tr. at 384.  The note again stated, however, that R.C. continued to minimize her behaviors and did not accept responsibility for them.  On

11

May 8, 2009, a progress note reported that R.C. had again been suspended from school for swearing and being disruptive and had a court hearing resulting from a probation violation.  Tr. at 376.

On June 3, 2009, the principal of R.C.'s school, Edward J. Ashcroft ("Ashcroft"), completed a School Activities Questionnaire at the request of the bureau.  Tr. at 234-35.  Ashcroft reported that he had known R.C. for three years and that she was in regular curriculum classes.  Ashcroft noted that R.C. had a poor attention span, needed instructions repeated three or four times, was somewhat able to work independently, was able to do her work quickly and completely, responded poorly to changes of routine, and had no ability to respond to criticism.  Ashcroft also noted that R.C. had the ability to progress in her reading, writing, and mathematics skills but that she did not have the focus or determination to do so.  Ashcroft also described R.C. as argumentative and aggressive, and she took one to two hours to calm down after losing her temper.  He added that he had completed the Questionnaire in collaboration with R.C.'s teachers.

During the 2008-2009 school year, R.C. earned four As, five Bs, four Cs, one D, and two Fs.  Tr. at 229.

*C. Hearing Testimony*

At the hearing, R.C. testified that she would be in 9th grade in the coming school year. Tr. at 18.  She described her suspensions for threatening a teacher, cursing, and fighting. Tr. at 19.  She also testified that she had been held back in seventh grade because, according to her mother, "I couldn't be around a lot of people when I [transfer] to Harding [High School].  So they kept me back."  Tr. at 20.  R.C. said that she was

12

currently taking Invega for her anger and Trazedone to help her sleep.  Tr. at 21.  She admitted that she fought every day with her brothers and sisters.  Tr. at 22.

Harris also testified at the hearing.  She testified that R.C. had a "lot of anger problems" that resulted in her physically harming her siblings and neighbors.  Tr. at 24.  She also stated that R.C. was not doing well at school because of her arguing with and threatening a teacher.  Tr. at 25.  She blamed R.C. for most of the altercations with her siblings.  Tr. at 26.  According to Harris, the medications that R.C. was taking did not change her behavior.  Tr. at 27.

### III.  Standard for Disability

A claimant under the age of 18 will be considered disabled if she has a "medically determinable physical or mental impairment, which results in marked and severe functional limitations."  42 U.S.C. § 1382c (a)(3)(C)(I).  To determine whether an individual under the age of 18 is disabled, the Social Security Administration uses a three-step sequential evaluation process to determine whether the claimant's impairments impose marked and severe functional limitations on the claimant.

In step one, the Commissioner determines whether the claimant is engaged in substantial gainful activity.  If she is, then the claimant is not disabled. 20 C.F.R. § 416.924(b).

At step two, the Commissioner must determine whether the claimant has a severe medically determinable impairment or a combination of impairments that is severe.  If the claimaint's impairment or combination of impairments is not severe, then the claimant is not disabled.  20 C.F.R. § 416.924(c).

At step three, the Commissioner must determine whether the claimant has an

13

impairment or combination of impairments that meets or medically equals the criteria of a listing or one that functionally equals an impairment in the listings. Thus, if the claimant's impairment or combination of impairments does not meet or medically equal a listed impairment, the Commissioner will determine whether the claimant's impairment or impairments results in limitations that functionally equal the listings. 20 C.F.R. § 416.926(a). The Commissioner accomplishes this by evaluating the claimant's functioning in six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. 20 C.F.R. § 416.926a (b)(1). If the claimant's impairment or impairments result in "marked" limitations in two domains, or an "extreme" limitation in one domain, the Commissioner will find the claimant's impairment or impairments to be functionally equal to those in the listings, and the claimant will be found to be disabled. 20 C.F.R. § 416.926a(d). A "marked" limitation is one which seriously interferes with a claimant's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2). An "extreme" limitation is one which interferes very seriously with the claimant's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(3).

### IV. Summary of Commissioner's Decision

In determining that R.C. is not disabled, the ALJ made the following relevant findings:

1. The claimant was born on July 7, 1994. Therefore, she was an adolescent on December 12, 2007, the date the application was filed, and is currently an adolescent.

2. The claimant has not engaged in substantial gainful activity at any time

14

relevant to this decision.

3. The claimant has the following severe impairments: conduct disorder.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5. The claimant does not have an impairment or combination of impairments that functionally equals the listings.  The claimant has less than marked limitation in acquiring and using information, less than marked limitation in attending and completing tasks, marked limitation in interacting and relating with others, no limitation in moving about and manipulating objects, no limitation in the ability to care for self, and no limitation in health and physical well-being.

6. The claimant has not been disabled, as defined in the Social Security Act, since December 12, 2007, the date the application was filed.

Tr. at 38-46 (citations omitted).

## V.  Standard of Review

This court's review is limited to determining whether there is substantial evidence in the record to support the administrative law judge's findings of fact and whether the correct legal standards were applied.  *See Elam v. Commissioner of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance."  *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Richardson v. Perales*, 402 U.S. 389 (1971).

## VI.  Analysis

Harris alleges that the ALJ erred because the ALJ failed to find that R.C.'s bipolar disorder and conduct disorder cause marked impairment in at least two domains of functioning.  In particular, Harris argues that these two disorders cause marked impairment in the domains of interacting with and relating to others, attending and completing tasks, and caring for self.  The Commissioner found that Harris did, indeed, have a marked impairment in interacting with and relating to others but denies that Harris has marked impairments in the domains of attending and completing tasks or in caring for self.

A.  *Whether the ALJ erred in failing to find that R.C. had a marked limitation in the domain of attending and completing tasks*

Harris contends that the ALJ erred in failing to find that R.C. had marked impairment in the domain of attending and completing tasks.  In support of this contention, Harris cites the following:

> Claimant's school records reflect suspensions for refusing to do work in class and displaying an inability to sit in class with any level of self-control (Tr. 119- 121, 165-167, 186-195, 219, 415).  Her treating physician at Valley Counseling has observed impaired attention and concentration since at least November 1, 2007 (Tr. 272).  On January 8, 2008, [Beauchene] reported that R.C. has "obvious" problems working without distracting herself or others, and changing activities without being disruptive (Tr. 145-148).  On May 8, 2008, claimant's interim progress report reflected that she is "easily distracted" and her GPA for the 2007-2008 school year was 0.00 due to her distractibility, as well as behavior and attendance problems (Tr. 181-182).
> Claimant's treating physician, Dr. William Price, reported on May 8, 2008 that R.C.'s bipolar disorder and associated mood swings cause significant impairment in her ability to function in school and within the home environment (Tr. 285). Treatment records from anger management sessions also report that the claimant has difficulty paying attention and following directions (Tr. 429).
> On June 3, 2009, claimant's principal of three years, Mr. Ashcroft, reported that Claimant has a "poor" attention span, needs prompts with re-explanation three to four times to follow instructions, and lacks the focus and determination to progress in learning the skills involved in reading, writing, and mathematics (Tr. 234).

16

Plaintiff's brief at 11-12.

As the Commissioner points out, while Beauchene's evaluation of R.C.'s functioning with respect to attending and completing tasks did include an opinion that R.C. had obvious problems in two areas, it also included the opinion that R.C. had either no problems or only slight problems in the other 11 areas of functioning related to attending and completing tasks.  In addition, the progress report which described R.C. as easily distracted also said that she completed assignments regularly.  Finally, although Ashcroft said that R.C. had a poor attention span and needed instructions repeated, he also said that she was able to do her work quickly and completely.

In finding that R.C. had less than marked limitations in acquiring and using information, the ALJ found that (1) R.C. was in regular classes in school, rather than special classes; (2) she had earned As and Bs at school; (3) she was held back in seventh grade due to her behavior, not her intellectual ability; (4) R.C.'s teacher found that she worked well on her own and had less than marked limitations in acquiring and using information; and (5) Dr. Chiarella determined that R.C. has no significant cognitive or academic deficiency.

The ALJ also gave the opinion of R.C.'s treating phsycian, Dr. Price, little weight because it was contradicted by R.C.  According to Dr. Price, R.C. suffers from bipolar disorder II and is significantly impaired in her ability to function at school and home due to mood swings.  He also opined that R.C. needs constant supervision.  The ALJ noted, however, that R.C. denied any depressive symptoms to Dr. Chiarella.  Thus, because R.C.'s own statements contradicted Dr. Price's diagnosis, the ALJ gave Dr. Price's opinion little weight.  Harris does not challenge the ALJ's refusal to give Dr. Price's

17

opinions controlling weight.

Whether the court agrees with the ALJ's finding that R.C. had less than marked impairment in her ability to attend and complete tasks is not the question. The question is whether the ALJ's determination that R.C. had less than a marked impairment in that domain is supported by substantial evidence. In this case, the ALJ cites substantial evidence in the record to support his determination. The opinions of R.C.'s teachers and principal and Drs. Chiarella and Dietz adequately support the ALJ's position. Harris does not cite sufficient contrary evidence to convince the court that the ALJ erred in reaching his determination. Consequently, Harris's contention that the ALJ erred in failing to find that R.C. had marked impairment in the domain of attending and completing tasks is not well-taken.

B.  *Whether the ALJ erred in failing to find that R.C. had a marked limitation in the domain of caring for self*

Harris also contends that the ALJ erred in failing to find that R.C. had marked impairment in the domain of caring for self. In support of this contention, Harris cites the following:

> Claimant's treating physician, Dr. William Price, has opined that claimant's bipolar disorder results in "significant" impairment in her ability to function in school and within the home environment (Tr. 285). The consultative examiner, Dr. David Chiarella, found R.C. to be guarded with a flat affect, and opined that her personal behavior as well as her social and emotional skills are developed at approximately 50% of age expectations (Tr. 278). Claimant's treatment records consistently reflect her sleep difficulties, specifying that the claimant stays awake until 3:00 or 4:00 a.m. even with taking Trazodone (Tr. 270, 331).
> On January 8, 2008, claimant's seventh grade language arts teacher reported that the claimant displays "obvious" problems with appropriately seeking attention, expressing anger, handling frustration, and using coping skills to meet the daily demands of the school environment and calm herself (Tr. 145-148). Claimant's school records and treatment records from Valley Counseling consistently reflect persistent problems with self-control, including stealing and

18

> destructive behavior, such as breaking a bedroom door, a house window, and her mom's car window (Tr. 266-267, 270, 383, 423, 425, 432, 434). Her treating physician from Valley Counseling, Dr. William Price, reported on May 8, 2008 that claimant required constant supervision from her parental figure until school resumed in the fall due to her bipolar disorder (Tr. 285). Treatment records from Valley Counseling on May 19, 2008 report that R.C. is "unable to cope with difficult situations" (Tr. 319). Claimant's principal of three years reported it takes claimant one to two hours to regain control when she loses her temper (Tr. 235). Claimant's difficulties with self-control and anger management have persisted despite multiple changes to her medications (Tr. 266-267, 290, 331, 336).

Plaintiff's brief at 12-13.

The Commissioner responds that much of the evidence Harris cites as demonstrating a limited ability to care for oneself is predominately relevant to R.C.'s limits on interacting with and relating to others. While that is true in part, most of Harris's objections are related to the domain of caring for oneself.

Title 20 C.F.R. § 416.926a(k) ("§ 416.926a(k)") describes the domain of caring for oneself as follows:

> [H]ow well you maintain a healthy emotional and physical state, including how well you get your physical and emotional wants and needs met in appropriate ways; how you cope with stress and changes in your environment; and whether you take care of your own health, possessions, and living area. . . . Caring for yourself effectively, which includes regulating yourself, depends upon your ability to respond to changes in your emotions and the daily demands of your environment to help yourself and cooperate with others in taking care of your personal needs, health and safety.

Section 416.926a(k) makes clear that caring for oneself includes not just caring for physical needs, including personal hygiene, but also caring for emotional needs, including the ability to "employ effective coping strategies, appropriate to your age, to identify and regulate your feelings, thoughts, urges, and intentions." §416.926a(k)(1)(iii). In addition, examples in the CFR of limited functioning in caring for oneself include disturbance in sleep patterns. § 416.926a(k)(3)(vi).

In finding that R.C. had no limitations in her ability to care for herself, the ALJ wrote, "Neither the claimant nor her mother testified to the claimant['s] experiencing any difficulties in her ability to care for herself.  Additionally, the claimant's principal noted that the claimant is neat and well groomed."  Tr. at 45.  The ALJ made no mention of R.C.'s emotional problems, including R.C.'s problems with coping with frustration, stress, and changes in her mood and environment; her inability to respond appropriately to criticism; or her repeated and serious problems with regulating her anger.  He also failed to address R.C.'s long-standing problems with sleeping.  Consequently, the ALJ failed to address significant evidence in the record related to this domain of functioning.  In light of these failures, the ALJ's determination that R.C. had no limitation in her ability to care for herself is not supported by substantial evidence.

## VII.  Decision

For the reasons set forth above, the court REVERSES the opinion of the Commissioner and REMANDS the case for a more complete determination of whether R.C. is limited in the domain of caring for herself, as discussed above.

**IT IS SO ORDERED.**

Date:  January 19, 2012                                s/ *Nancy A. Vecchiarelli*
                                                      Nancy A. Vecchiarelli
                                                      U.S. Magistrate Judge